UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ESVIN QUINONEZ MAZARIEGOS, | Civil Action No. 12-5626(FLW) |
| Plaintiff, | |
| v. | OPINION |
| MONMOUTH COUNTY CORRECTIONAL INSTITUTION, et al., | |
| Defendants. | |

WOLFSON, United States District Judge:

I.      INTRODUCTION

This matter has been opened to the Court on a motion for summary judgment filed by Monmouth County, the former Warden of Monmouth County Correctional Institution (MCCI) Brian Elwood, and MCCI correctional officer Christopher Dixon (collectively referred to as "the County Defendants"). The County Defendants seek dismissal of Plaintiff's Fourteenth Amendment Due Process claims (1) against Officer Dixon for failing to protect Plaintiff from an assault by other inmates at MCCI and (2) against Warden Brian Elwood and the County of Monmouth for failing to provide adequate medical treatment following the assault, which

allegedly resulted in permanent injuries to Plaintiff's eyes.  For the reasons explained in this

Opinion, the Court will grant the County Defendants' motion for summary judgment.

## II.     PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### a.  Procedural History

On August 27, 2012, while Plaintiff was being held as a pretrial detainee at the MCCI in

Freehold, New Jersey, he filed, *pro se*, the initial Complaint in this action.[1] (ECF No. 1.) By

Order entered September 13, 2012, this Court administratively terminated the case because

Plaintiff had not prepaid the $350 filing fee or applied to proceed *in forma pauperis*, pursuant to

28 U.S.C. § 1915. (ECF No. 2.)  On October 1, 2012, Plaintiff paid the filing fee and the Clerk

filed the Complaint. (ECF No. 3.)  On January 28, 2013, Plaintiff signed a document labeled

motion to supplement the complaint.[2]   (ECF Nos. 4, 6.)   The body of this motion contained an

Amended Complaint naming MCCI, MCCI Warden Brian Elwood, MCCI Corrections Officer

Dixon, Classification Officer John Doe, Doctor John Doe, Nurse John Doe, and Nurse Jane Doe.

*Id.*   As no responsive pleading had been filed at the time Plaintiff sought to amend the

Complaint, *see* Fed. R. Civ. P. 15(a)(1)(B), the Court granted the motion to amend the Complaint

---

[1] On July 15, 2011, federal officials arrested Plaintiff pursuant to an arrest warrant and federal criminal complaint charging him with illegal reentry by an alien who was deported from the United States.  *See United States v. Quinonez-Mazariegos*, Crim. No. 12-0467 (MLC) (D.N.J. filed July 12, 2012). On July 2, 2013, pursuant to a plea agreement, Plaintiff pled guilty to one count of being an alien who knowingly entered the United States after being deported, in violation of 8 U.S.C. § 1326(a) and (b)(2).  On October 9, 2013, Plaintiff was sentenced to a 51-month term of imprisonment.

[2] The initial Complaint names only MCCI as a defendant. Plaintiff alleges in the initial Complaint that, while he was detained at MCCI, he was attacked by inmates and his eyes were "severely damaged." (ECF No. 1 at 5.)  The initial Complaint asserts that, although doctors were supposed to monitor his eye, he received no follow-up medical care for seven months. He alleges that when he was ultimately examined by an eye doctor, the doctor "told me I had glaucoma from trauma."  *Id.*

on March 21, 2013, and deemed ECF No. 6 to be Plaintiff's Amended Complaint.   (*See* ECF No. 7.)

In the Amended Complaint (ECF No. 6), Plaintiff alleges that while he was incarcerated at MCCI in 2011, he informed Correction Officer Dixon that certain gang members had threatened his life, but "nothing was done to investigate" the threat and his "pleas for help w[ere] ignored."  (ECF No. 6 at 3.)  Plaintiff alleges that on October 7, 2011, while he was housed with county and state inmates in the maximum security unit of the jail, several "Surenos-13 gang members" assaulted him for over six minutes. *Id.*  He asserts that, "[w]hile plaintiff was being attacked and beat[en], defendant Di[xon] was nowhere to be found," and Officer Valentino eventually called the code. *Id.*  Plaintiff alleges that he was taken to a hospital by ambulance and he had severe injuries to his eyes and on his torso, stomach, chest, arms, and back.  In addition, he contends that Defendants Warden Elwood and Classification Officer John Doe "were aware that [MCCI] ha[d] a gang problem, and they [took] no corrective action to control and/or abide by State Administrative Regulations regarding gang control."  *Id.*

Plaintiff further asserts that Defendant Doctor John Doe "refused to provide plaintiff with any aftercare treatment, pain medication and [an] eye doctor referral to determine the extent of [his] eye injury," and Nurses John Doe and Jane Doe "refused to place plaintiff's name [on] the sick call list" and ignored his requests for medical treatment. (ECF No. 6 at 4.) Plaintiff alleges that after seven months, he "was finally sent to see an eye specialist who diagnosed [his] eye injury as glaucoma due to the trauma from being assaulted and beat[en]." *Id.*  He states that he

3

now "has a permanent eye injury as a direct result [of] the delay in providing [him] with specialist medical care." *Id.* For violation of his rights, he seeks injunctive relief and damages. *Id.* at 5.

The Monmouth County Defendants filed an Answer substantially denying Plaintiff's allegations and raising several affirmative defenses, as well as filing a Third Party Complaint against Correct Care Solutions LLC ("CCS"), which seeks indemnification and contribution, as well as attorney's fees and costs from CCS. (Answer and Third Party Complaint, ECF No. 17.) In response to the Third Party Complaint, CCS filed a motion to dismiss the Amended Complaint for failure to state a claim upon which relief may be granted or, alternatively, for summary judgment. (ECF No. 22-4.) CCS, further, moved to dismiss the Third Party Complaint against it as moot. *Id.* The County Defendants thereafter filed a cross motion to dismiss the Amended Complaint or, alternatively, for summary judgment, which substantially mirrored CCS's motion. (ECF No. 28.)

The Court denied without prejudice Defendants' hybrid motions on procedural grounds and proceeded to screen Plaintiff's Amended Complaint pursuant to under 28 U.S.C. 1915A, which is governed by the same standard as motions to dismiss made pursuant to Rule 12(b)(6). After screening, the Court dismissed the 42 U.S.C. § 1983 failure to protect claim without prejudice against Monmouth County, Brian Elwood, Classification Officer John Doe, Dr. John Doe, Nurse Jane Doe, and Nurse John Doe. The Court allowed the § 1983 failure to protect claim to proceed past dismissal against Officer Dixon. The Court dismissed the § 1983 inadequate medical care claim without prejudice against Christopher Dixon and Classification Officer John Doe. The Court allowed the § 1983 inadequate medical care claim to proceed past dismissal against Monmouth County, Brian Elwood, Dr. John Doe, Nurse Jane Doe, and Nurse

John Doe.  Although the Court construed Plaintiff to raise claims against the John and Jane Doe

Doctors and Nurses, they were not added to the docket at that time.  In its Opinion and Order,

however, the Court directed the attorney for Monmouth County and Warden Elwood to provide

the names of the doctors and nurses at MCCI who were responsible for providing medical care to

Plaintiff during the relevant time period.  (*See id.*, Op. at 19 n.15; *see also* ECF No. 35.)  The

Court also appointed counsel for Plaintiff, subject to his filing, and the Court's granting, of his

application to proceed *in forma pauperis*.

Plaintiff's application to proceed *in forma pauperis* was docketed on April 7, 2014, and

was granted by the Court on the same date.  (ECF Nos. 37-38.)  On April 14, 2014, Paul L.

LaSalle, Esquire wrote to the Court on behalf of County Defendants, and stated as follows:

 "[A]fter a review of records relative to Plaintiff's incarceration at the MCCI, it appears that

Plaintiff was treated by Kabeeruddin Hashmi, M.D.  With regard to the nurses, the names of

same cannot be ascertained from their handwritten signatures contained within the records."

(ECF No. 39.)  On April 28, 2014, the law firm of Drinker, Biddle & Reath, LLP, was appointed

to represent Plaintiff. (ECF No. 40.)  On July 24, 2014, CCS filed its Answer to the Third Party

Complaint by the County Defendants and a Cross Claim against the County Defendants.

On February 18, 2015, the Magistrate Judge held a status conference in which Plaintiff's

appointed counsel requested a stay of the action pending resolution of Plaintiff's pending

administrative deportation proceedings and Defendants agreed to the relief requested.  (ECF No.

50.)  The Magistrate Judge entered an Order staying and administratively terminating the case on

February 19, 2015.  (*Id.*)  Plaintiff wrote to the Magistrate Judge several times, requesting that

the stay be lifted so that the case could proceed.  (*See* ECF Nos. 51-52, 57.)  On December 2,

2015, the Magistrate Judge denied an informal application by Plaintiff's appointed counsel to be

relieved during the pendency of Plaintiff's administrative deportation proceedings. (ECF No. 58.)  The Magistrate Judge also granted Plaintiff's pro se application to reopen the matter and restored the matter to the Court's active docket.  (*Id.*)

On February 2, 2016, the Court held a status conference and issued a Revised Scheduling Order, setting the deadline for fact discovery as April 4, 2016, and the deadline for dispositive motions as March 11, 2016.[3]  On March 11, 2016, the County Defendants filed the instant motion for summary judgment.  (ECF No. 61.)  On the same date, CCS filed a letter response "joining" the County Defendants' motion for summary judgment.  (ECF No. 62.)  On April 1, 2016, Plaintiff's appointed counsel filed opposition to the motion.  On the same date, CCS filed what it characterizes as a "reply brief" in response to Plaintiff's opposition.  The County Defendants filed their reply on April 13, 2016.  (ECF No. 67.)

### b.  Relevant Facts on Summary Judgment

#### i.  Facts Relating to Plaintiff's Failure to Protect Claims

Plaintiff was incarcerated at MCCI from July 17, 2011 to October 29, 2013. (Plaintiff's Counterstatement of Material Facts (CSMF at ¶ 1 (citing Certification of Vik C. Jaitly ("Jaitly Cert.")¶ 2, Ex. A, Plaintiff 's Dep. Tr., 27:1-3).)   Prior to the assault, which occurred on or around November 8, 2011, Plaintiff informed Officer Christopher Dixon that he felt unsafe or threatened at MCCI on two separate occasions.[4] (*Id.* at ¶ 2 (citing Jaitly Cert. ¶ 2, Ex. A, 59:11-21; 60:21-61:11).)  Officer Dixon denies having any conversations with Plaintiff while Plaintiff

---

[3] The initial scheduling Order entered by the Magistrate Judge on August 21, 2014, set deadlines for motions to amend/join new parties as October 31, 2014.

[4] Defendants' moving papers list the date of the assault as November 11, 2011.

was incarcerated at MCCI.  (ECF No. 61-4 County Defendants Statement of Material Facts

("DSMF") at ¶ 27 (citing Ex. D, # 8).)

Plaintiff testified in his deposition about his conversations with Officer Dixon:

> Q:      At anytime did you write to anyone at MCCI advising that you had enemies or had been threatened?
>
> A:      I never wrote nothing but I had told an officer that I was threatened.  I didn't feel safe [sic].
>
> Q:      Okay. And who was that officer?
>
> A:      Officer Dixon.
>
> (Ex. A, 52:17-23.)
>
> . . . .
>
> Q:      …did you request protective custody at anytime either before this or after this date, this date being March 26, 2013?
>
> A:      No.
>
> Q:      No?
>
> A:      I just told officer that I was afraid being in the unit. And nothing was done because he say nothing's going to happen to you.
>
> (Ex. A, 49:02-10.)
>
> . . . .
>
> A: …And in the morning one of the inmates said be careful because, you know, they mad that you changed the TV and everything. They might try to jump you. That's [what] one of the inmates said.
>
> Q:      What inmate said that to you?
>
> A:      Mr. DiSosa.
>
> Q:      And what did you do after he told you that?
>
> A:      I tried—I was around.  I tried to go look for Officer Dixon to tell him I was going to, you know, that I was in danger, but Mr. Dixon was – I don't know what he was doing. He wasn't paying no mind to me.  So he ignore[d] me.
>
> (Ex. A, 57:03-15.)
>
> . . . .

> Q:      Let's talk about [Officer] Chris Dixon for a minute. Prior to the date of the alleged assault on November 8, 2011 how many times had you ever talked to him?
>
> A:      One time.
>
> Q:      One time?
>
> A:  Two time[s]. The first day that I got there and that time that I told him that I wasn't feeling safe in the unit. That was about two, three weeks before the incident I went to Officer Dixon and told him that I wasn't feeling safe in the unit.

(Ex. A., 59:11-21.)

> . . . .
>
> Q: What was Chris Dixon doing the first time you spoke with him which you testified was two to three weeks before the assault? Was he the corrections officer in the pod?
>
> A: I don't know if he was the correction in the pod but he was there that day. Well, I guess he was the correction part of the pod because he was there the whole time when I was there.
>
> Q:      Was he doing rounds?
>
> A: Yeah, by that time he was doing rounds. And I told him because, you know, when inmates see you talk to officers they think you snitching or something. And I'm afraid of this place. So when he was doing his rounds I told Officer Dixon I'm afraid of being in this unit. He said nothing going to happen to you because ain't no threats or you be okay. That was it.

(Ex. A., 60:21-61:11.)

Plaintiff also testified in his deposition that during that first conversation, he told Officer Dixon that he was afraid "because of the environment I'm around.  The people I'm around.  That was it."  (Pl. Dep. at 76: 22-77:2.)  He testified that Officer Dixon responded by stating "oh, nothing's going to happen to you.  You'll be okay."  (*Id.*)

Plaintiff further testified as follows regarding his second conversation with Officer Dixon immediately prior to the assault against him:

> Q:      Okay.  At some point on November 8, 2011 did you have a conversation with Officer Dixon?
>
> A:      Yes.
>
> Q:      And what time was that conversation?

A:      Like 15, 20 minutes—15, 10 minutes before the attack.

Q:      What time of day would that have been?

A:      Around, maybe, 8 o'clock, 7:30. Can't remember the time.

Q:      So how long had Officer Dixon been on duty at that point?

A:      For maybe an hour, two hours. I can't remember how long he was there.

Q:      Why did you go to talk to Officer Dixon?

A:      Because before in the morning when the inmate Mr. DiSosa told me be careful because these guys is mad because you changed the TV last night. So I went and told Officer Dixon that – I tried to go and talk to [Officer] Dixon about, you know, I think I'm getting jumped. I'm getting jumped. I don't want to be here. He said – well, he was busy. I don't know he got a cell phone. I don't know what he had. And he normally kept on walking. Looked at me, kept on walking.

(Ex. A, 71:14-72:11.)

Q: Did you tell Officer Dixon why you thought you were going to get jumped?

A: No, this time he got up from the desk and disappeared.  Got up. He was mad that he was being bothered.

(Ex. A, 74:5-9.)

After his conversation with Officer Dixon, Plaintiff returned to the common area where the TV was located and was assaulted by three inmates.  (*Id.* at 3 (citing Jaitly Cert. ¶ 2, Ex. A, 77:22-84:17).)  During the assault, which lasted approximately four to six minutes, no one came to his rescue. (*Id.* at ¶ 4 (citing Jaitly Cert. ¶ 2, Ex. A, 80:04-22).)  When asked in his deposition why he returned to the common area if he believed he would be jumped, Plaintiff stated as follows:   "Because, like I said, I didn't believe that was going to happen to me.  I didn't know whether I was going to get jumped or not."  (Pl. Dep. at 75:5-76:1.)

### ii.   Facts Relating to Plaintiff's Inadequate Medical Care Claims

Immediately after the assault, Plaintiff was taken to a hospital.  (*Id.* at ¶ 5 (Jaitly Cert. ¶ 2, Ex. A, 87:23-88:1).)  At this hospital visit, Plaintiff received treatment for his eyes, neck, shoulder, and arms. (*Id.* at ¶ 6 (Jaitly Cert. ¶ 2, Ex. A, 87:23-89:23).)  Plaintiff's medical

treatment was monitored at MCCI by outside contractor, Correct Care Solutions ("CCS") and its employees. (*Id.* at ¶ 7 (citing Jaitly Cert. ¶ 4, Ex. C, Service Contract between MCCI and CCS).) Plaintiff was examined by nurses and, in some cases, by doctors.  (*Id.* at ¶ 8 (citing Jaitly Cert. ¶ 2, Ex. A, 96:11-21).)  One of the doctors who examined Plaintiff was Dr. Kabeeruddin Hashmi, the medical director at CCS.  (*Id.* at ¶ 9 (citing Jaitly Cert. ¶ 5, Ex. D, Dr. Hashmi's Dep. Tr., 15:17-19).)

Although Plaintiff was only given pain medication initially for his eye injuries, the condition of Plaintiff's eyes severely worsened. (*Id.* at ¶ 10 (Jaitly Cert. ¶ 6, Ex. E, Health Service Requests submitted in 2012).)  On January 24, 2013, Plaintiff submitted a Health Service Request in which he wrote "eye pain and headache; eye pressure to[o] strong." (*Id.* at 11 (citing Jaitly Cert. ¶ 7, Ex. F, Health Service Request dated January 24, 2013).)  Following this request, Plaintiff was seen by an 'outside' ophthalmologist on February 15, 2013. (*Id.* at ¶ 12 (citing Jaitly Cert. ¶ 8, Ex. G, February 15, 2013 Consultation Note).)  The ophthalmologist who saw Plaintiff wrote a consultation note stating the following: "Recommend patient see Glaucoma specialist as soon as possible." (*Id.* at ¶ 13 (citing Jaitly Cert. ¶ 8, Ex. G, February 15, 2013 Consultation Note).)  This consultation note is signed by Dr. Hashmi.  (*Id.* at ¶ 14 (citing Jaitly Cert. ¶ 5, Ex. D, 19:8-20).)

Over the next two months, Plaintiff submitted a number of Health Services Requests. Plaintiff submitted a Health Services Request on February 20, 2013 stating: "eye problem." (*Id.* at ¶ 15 (citing Jaitly Cert. ¶ 9, Ex. H).)  He submitted a Health Services Request on March 16, 2013 stating: "eye problem emergency; [loss] of vision." (*Id.* at ¶ 16 (citing Jaitly Cert. ¶ 10, Ex. I.)  Plaintiff submitted a verbal Health Service Request on March 17, 2013 stating: "Vision impaired; pain to left eye."  (*Id.* at ¶ 17 (citing Jaitly Cert. ¶ 11, Ex. J).)  He submitted a Health

Service Request on March 23, 2013 stating: "I'm having a very strong pain in my left eye and lost [half] of my vision and need to see a doctor as soon as possible." (*Id.* at ¶ 18 (citing Jaitly Cert. ¶ 12, Ex. K).)  He submitted a Health Service Request on March 31, 2013 stating: "I need to see the doctor for my eye; Please hurts a lot." (*Id.* at ¶ 19 (citing Jaitly Cert. ¶ 13, Ex. L).)  Plaintiff submitted a Health Service Request on April 14, 2013 stating: "My eye is really hurting me and blind; would like to know why nothing has been done yet." (*Id.* at ¶ 20 (citing Jaitly Cert. ¶ 14, Ex. M).)

Plaintiff also testified in his deposition that he met with Warden Elwood on an unspecified date regarding the inadequacy of his medical treatment.  (*Id.* at ¶ 25 (citing Jaitly Cert. ¶ 2, Ex. A, 29:19-33:15).)  It appears undisputed, however, that Defendant Warden Elwood retired as Warden on December 10, 2012, and could not have been the Warden with whom Plaintiff met in April 2013.[5]  (*See* ECF No. 61-4, DSMF at ¶¶ 35, 39-42; Pl. Opp. Br. at 9-10.)

On April 17, 2013, two months after Plaintiff was prescribed an evaluation by a specialist, Plaintiff saw a glaucoma specialist, Dr. Paul Lama. (*Id.* at ¶ 21 (citing Jaitly Cert. ¶ 15, Ex. N).)  In his notes, Dr. Lama wrote that Plaintiff "was steadily losing vision in the left eye" and "lost fixation about a month ago." (*Id.* at ¶ 22 (citing Jaitly Cert. ¶ 15, Ex. N).)  In May, 2013, Plaintiff had surgery on both eyes.  (DSMF at ¶ 44 (citing Pl. Dep at 105-106.)  In his deposition taken on January 6, 2015, Plaintiff has testified that he is currently blind in his left eye and has no peripheral vision in his right eye.  (CSMF at ¶ 23 (citing Jaitly Cert. ¶ 2, Ex. A, 109:11-19).)

---

[5] It is also undisputed that Plaintiff submitted an Inmate Grievance Form addressed "to the Warden" on October 4, 2013 complaining about medication he was receiving after his surgery in May 2013.  (CSMF at ¶ 24 (citing Jaitly Cert. ¶ 18, Ex. Q, Grievance Form); County Defendants' Response to CSMF at ¶ 24.)

### III.  **STANDARD OF REVIEW**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law."  *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor .'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 447 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002).

The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment.  *Celotex*, 477 U.S. at 330.  "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg.*, Inc., 243 F.3d 130, 138 (3d Cir. 2001).  The non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005) (quotations omitted).  Under *Anderson*, Plaintiffs' proffered evidence must be sufficient to meet the substantive evidentiary standard the jury would have to use at trial. 477 U.S. at 255.  To do so, the non-moving party

must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotations omitted); *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokle*y, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## IV.   ANALYSIS

The County Defendants have moved for summary judgment on Plaintiff's civil rights claim for failure to protect against Officer Dixon and for inadequate medical care against

Warden Elwood and the County of Monmouth.  Both claims are brought pursuant to 42 U.S.C. § 1983 and are grounded in the Due Process Clause of the Fourteenth Amendment.[6]

### a.  Failure to Protect Claim Against Officer Dixon

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)) (internal quotation marks and ellipses omitted).  The Eighth Amendment imposes "a duty upon prison officials to take reasonable measures to protect prisoners from violence at the hands of other prisoners." *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997).  To establish a failure to protect claim, an inmate must demonstrate that: (1) he or she is "incarcerated under conditions posing a substantial risk of serious harm;" and (2) the prison official acted with "deliberate indifference" to his or her health and safety.  *Farmer*, 511 U.S. at 834.

Deliberate indifference requires that an official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.  "The knowledge element of deliberate

---

[6] As a pretrial detainee, rather than a convicted prisoner, Plaintiff retains liberty interests grounded in the Due Process Clause of the Fourteenth Amendment.  *See Fuentes v. Wagner*, 206 F.3d 335, 341 n. 9 (3d Cir.), *cert. denied*, 531 U.S. 821 (2000).  Practically speaking, however, courts have analyzed claims of failure to protect by pretrial detainees under the "deliberate indifference" standard set forth in Eighth Amendment jurisprudence, as the due process rights of a pretrial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. *Mohamed v. Aviles*, 2007 WL 923506, at *6 (D.N.J. March 26, 2007) (citing *Turner v. Cupp*, 238 F.3d 424, 2000 WL 1141423, at *2 (6th Cir. Aug.4, 2000)).  In similar cases, the Third Circuit has indicated that deliberate indifference is the appropriate standard in the context of a Fourteenth Amendment failure-to-protect claim.  *See A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 587 (3d Cir. 2004).  The Eighth Amendment standard has likewise been applied to inadequate medical care claims brought by pretrial detainees. *See Hubbard v. Taylor*, 399 F.3d 150, 166 n. 22 (3d Cir. 2005) (applying Eighth Amendment doctrine to pretrial detainees raising claims of failure to protect and inadequate medical care); *see also Strobert v. Ocean Cty. Jail*, No. CIV.A. 07-3172 GEB, 2011 WL 63601, at *4 (D.N.J. Jan. 7, 2011) (explaining same).

indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Beers–Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001); *see also Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 323 (3d Cir. 2014); *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012). Thus, in order to survive defendant's summary judgment motion, plaintiff must produce sufficient evidence supporting the inference that defendant "knowingly and unreasonably disregarded an objectively intolerable risk of harm." *Beers–Capitol*, 256 F.3d at 132 (internal citation and quotation omitted); *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). Knowledge may be shown where the official has actual notice of the risk, *Nami v. Fauver*, 82 F.3d 63, 67–68 (3d Cir.1996), or where the risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Farmer*, 511 U.S. at 842. An inmate "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Davis v. Muscarella*, 615 F. Supp. 2d 296, 302 (D. Del.), *aff'd sub nom. Davis v. Williams*, 354 F. App'x 603 (3d Cir. 2009) (citing *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir.1996)).

Here, the County Defendants contend that Plaintiff's failure to protect claims against Officer Dixon fail for the following reasons: (1) Plaintiff cannot prove he was incarcerated under conditions posing a substantial risk of serious harm; (2) Officer Dixon cannot be deliberately indifferent to a serious risk of harm to Plaintiff because he denies having any communications with Plaintiff during his incarceration at MCCI and denies that Plaintiff told him about any threats against Plaintiff; and (3) because Plaintiff's "alleged communications with Officer Dixon

15

are palpably insufficient to establish that Officer Dixon was deliberately indifferent to a known excessive risk to Plaintiff's safety."  (ECF No. 61-4, Moving Br. at 16.)

Applying *Farmer* to the instant action, the first question is whether Plaintiff has provided sufficient facts showing that Plaintiff in particular or inmates in general faced a substantial risk of assault at MCCI.  The second question is whether Plaintiff has provided sufficient facts showing that that Defendant Dixon was aware of and disregarded a substantial risk of harm.[7]

Even assuming, without deciding, that Plaintiff has provided sufficient facts showing that he faced a substantial risk of assault at MCCI, he has not provided sufficient facts showing that Officer Dixon knew of the risk and intentionally disregarded it.  Although Plaintiff has testified that he had two conversations with Officer Dixon, as explained below, the content of his statements to Officer Dixon are too vague, without more, to raise the inference that Officer Dixon was aware of any substantial risk to Plaintiff's safety, and Plaintiff's own conduct suggests that he did not believe he faced a serious risk of harm.

In several unpublished decisions, the Third Circuit has addressed the types of complaints by inmates that are too general or vague to raise the inference that a prison official was aware of a risk of substantial harm.  In *Counterman v. Warren County Corr. Facility*, 176 F. App'x 234,

---

[7] The Court notes that Plaintiff has not presented any evidence of a generalized threat of serious harm at MCCI.  Where there is a generalized threat of serious harm, a plaintiff need not present evidence of a particularized threat against him.  As explained by the Third Circuit in *Beers-Capitol*, 256 F.3d at 131-32, "*Farmer* made clear that a prison official defendant cannot escape liability by showing that he did not know that a particular inmate was in danger of attack: 'it does not matter . . . whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.'" *Id.* (citing *Farmer*, 511 U.S. at 843).[7]  In his Complaint, Plaintiff contends that Defendants Warden Elwood and Classification Officer John Doe "were aware that [MCCI] ha[d] a gang problem, and they [took] no corrective action to control and/or abide by State Administrative Regulations regarding gang control."  (ECF No. 6, at 3.)  However, in his Counterstatement of Material Facts, Plaintiff has provided no facts to substantiate this allegation.

237-239 (3d Cir. 2006), the plaintiff presented evidence that several prison officers knew that he was the target of harassment and aggression by several inmates prior to the attack and thus had the requisite knowledge for deliberate indifference.  The Third Circuit, in upholding the district court's grant of summary judgment, found that evidence that those inmates bragged to prison guards about their mistreatment of plaintiff and that the officers told Plaintiff "not to take it" and to "fight back" was insufficient to raise the inference that the officers were actually aware of an excessive risk to plaintiff's safety.  The Court determined that "[t]he inmates' boasts conveyed harassment and unpleasantness" but "did not lead to the inference that [the officer] must have known of an intolerable danger to [Plaintiff] that would evince an Eighth Amendment violation." *Id.* at 239.  The Court noted however that another portion of deposition testimony which made clear that the inmates specifically bragged to officers about "harassing and *beating up on*" plaintiff, lent more credence to plaintiff's position, but declined to consider it because the plaintiff had not submitted the testimony below.  *Id.* at 239 fn 1 (emphasis in original).

Similarly, in *Jones v. Beard*, 145 F. App'x 743, 745 (3d Cir. 2005), the Third Circuit held that prison guards did not have actual knowledge of a threat of serious harm to an inmate in part because the inmate had not "articulated specific threats of harm" to the prison official.  The Third Circuit held that Jones' statements in the three weeks leading up to the attack were insufficient to establish that the defendant guards had actual knowledge of a threat of serious harm to Jones:

> Jones told several guards during September 2002 that he and [his cell mate] were not getting along and asked whether he could be moved into a new cell. However, the record is devoid of evidence establishing that Jones articulated specific threats of serious harm, or that he made multiple complaints about [his cellmate] to any one guard. *See, e.g., Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir.1998) (noting that "threats between inmates are common" and do not, in every circumstance "serve to impute

> actual knowledge of a substantial risk of harm") (citations and internal quotations omitted). Moreover, although Jones alleged in his complaint that he filed institutional grievances complaining about [his cellmate] prior to the attack, prison records indicate a complete lack of documentation to substantiate this allegation. *See, e.g., Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (the non-moving party cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint; rather, he must point to concrete evidence in the record that supports each and every essential element of his case).

*Jones*, 145 F. App'x at 745–46; *see also Blackstone v. Thompson*, 568 F. App'x 82, 84–85 (3d Cir. 2014) (no liability where plaintiff "had just one communication" with prison official, in which Plaintiff "stated that he was not 'getting along' and did not 'feel comfortable' with his cellmate"); *Bizzell v. Tennis*, 449 F.App'x 112, 115 (3d Cir. 2011) (plaintiff's complaints to prison officials that his eventual attacker was unstable and trying to set him up found insufficient to raise a significant risk of serious harm where plaintiff did not complain about threat to his safety).

      To survive the County Defendants' motion for summary judgment, Plaintiff must to point to evidence in the record that Dixon both knew of and was deliberately indifferent to an excessive risk to his safety.  *See Beers–Capitol*, 256 F.3d at 131. "When making a determination as to deliberate indifference, the court must 'focus [on] what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be).'" *Blackstone*, 568 F. App'x at 83–84 (citing *Hamilton*, 117 F.3d at 747.  Deliberate indifference is "a state of mind more blameworthy than negligence." *Id.* (citing *Farmer*, 511 U.S. at 835). Thus if a Defendant "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," liability will not attach.  *Id.* (citing *Farmer*, 511 U.S. at 844).

Here, there is no indication in the record that Officer Dixon made the inference that Plaintiff faced a substantial risk of serious harm and disregarded it. The record reflects that Officer Dixon had only two alleged communications with Plaintiff. Plaintiff testified in his deposition that during his first conversation with Officer Dixon, he stated that he was afraid "because of the environment I'm around. The people I'm around. That was it." (Pl. Dep. at 76: 22-77:2.) He testified that Officer Dixon responded by stating "oh, nothing's going to happen to you. You'll be okay." (*Id.*) Plaintiff's second alleged conversation with Officer Dixon occurred shortly before Plaintiff was assaulted and after Inmate DiSosa told Plaintiff that unidentified inmates were "mad that [Plaintiff] changed the TV [channel] and "might try to jump [Plaintiff]." (Ex. A, 57:03-15.) Plaintiff testified that after his conversation with Inmate DiSosa, Plaintiff "tried to go and talk to [Officer] Dixon about, you know, I think I'm getting jumped. I'm getting jumped. I don't want to be here." (Pl. Dep., Ex. A, 71:14-72:11.) Plaintiff's statement to Officer Dixon that he thought he might get jumped is vague at best, and Plaintiff admits in his deposition that he did not communicate any other specific information about the possible threat to Officer Dixon, such as why he thought he might get jumped, when the assault might occur, or who the possible assailants were. Plaintiff contends that Officer Dixon, who may have been looking at his cell phone, ignored him and "got up from the desk and disappeared" as Plaintiff was trying to talk to him. (*Id.* at 71:14-72:11; 74:5-9.) At best, this conduct suggests that Officer Dixon failed to listen to Plaintiff; without more, a jury could not infer from this conduct that Officer Dixon intentionally disregarded a serious risk to Plaintiff's safety.

Plaintiff's testimony about his own conduct after Officer Dixon allegedly disappeared also undermines his contention that Officer Dixon intentionally ignored a serious threat to Plaintiff's safety. It is undisputed that after Officer Dixon walked away, Plaintiff returned to the

common area where the TV was located.  (CSMF at ¶ 3 (citing Jaitly Cert. ¶ 2, Ex. A, 77:22-84:17).)  When asked in his deposition why he returned to the common area if he believed he would be jumped, Plaintiff stated as follows:   "Because, like I said, I didn't believe that was going to happen to me.  I didn't know whether I was going to get jumped or not."  (Pl. Dep., Ex. A at 75:5-76:1.)

Absent any other evidence of Officer Dixon's culpable state of mind, the evidence presented by Plaintiff is insufficient to permit a reasonable finder of fact to infer that Officer Dixon both knew of and intentionally disregarded an excessive risk to Plaintiff's safety.  As such, the Court will grant summary judgment to Officer Dixon on the failure to protect claim.

### b.  Claims of Inadequate Medical Treatment Against Warden Brian Elwood and the County of Monmouth

It appears that Plaintiff has conceded that summary judgment should be granted as to his inadequate medical care claims against the County Defendants.  In his Opposition, Plaintiff

> concedes that, after completing discovery, there are no facts that support a claim of inadequate medical care against Defendant Brian Elwood because [he] did not have personal involvement with [Plaintiff's] medical treatment.  Therefore, [Plaintiff] does not wish to pursue the inadequate medical care claim against Defendant Brian Elwood.

In their reply brief, the County Defendants contend that, in light of this concession, summary judgment must be granted as to Defendants Brian Elwood and the County of Monmouth.  (ECF No. 67, County Reply at 7.)  The Court agrees, and will grant summary judgment in favor of County Defendants Brian Elwood and the County of Monmouth.[8] (*Id.*)

---

[8] Plaintiff's brief does not address the claim against the County of Monmouth.  In screening Plaintiff's Amended Complaint, the Court found that Plaintiff adequately pleaded a § 1983 medical care claim against the County based on Warden Elwood's failure to act.  (ECF No. 34, Op. at 20.)  The Court further explained that "[a]t this early stage of the proceeding, and in the absence of full briefing on the question of which county official has final policymaking authority

### c.  Third Party Defendant CCS and John Doe Employees of CCS

In connection with the instant motion, CCS filed a letter that purports to "join" the

County Defendants' motion for summary judgment and states as follows:

> Furthermore, as the direct claims filed by Plaintiff arising under 42
> U.S.C. § 1983 against Christopher Dixon an Monmouth County
> Correctional Institution pertaining to medical care should be
> dismissed pursuant to law, the third party claims against Correct
> Care Solutions, LLC must also be dismissed with prejudice.

(ECF No. 62.)  Presumably, CCS's request is directed at the third party claims for

indemnification and contribution; however, the Third Party Complaint against CCS also seeks

attorney's fees and costs.  It is not clear whether the County Defendants wish to dismiss their

claims for attorney's fees and costs, as their motion is silent regarding the dismissal of the Third

Party Complaint.  CCS also attempts to raise arguments beyond those raised by the County

Defendants in their motion for summary judgment.  After receiving Plaintiff's Opposition, CCS

submitted what it terms a "letter brief" addressing Plaintiff's arguments that he still has viable

claims against CCS and its employees, which are not the subject of the current motion for

summary judgment.  The County Defendants' moving papers take no position on the liability of

CCS or its employees and focus solely on Plaintiff's failure to establish the liability of the

County Defendants. (*See, e.g.*, ECF No. 67, County Reply at 6-7.)  The Court declines to address

CCS's arguments for dismissal of the Third Party Complaint or the viability of any claims

---

under New Jersey law with respect to the conditions provided to MCCI inmates and with respect
to monitoring CCS's compliance with its contractual obligations, this Court will not at this time
find as a matter of law that Warden Elwood was not a policymaker for Monmouth County with
respect to the failure to treat Plaintiff's blindness." (*Id.*)  Because the Court has granted summary
judgment as to Warden Elwood, it will likewise grant summary judgment as to the County of
Monmouth as to the *Monell* claim premised on Warden Elwood's failure to act.

against CCS employees in the context of this instant motion.  CCS is free to file the appropriate motion to dismiss the Third Party Complaint.[9]

In this regard, the Court also notes that Plaintiff has not moved to amend the Complaint to identify the John and Jane Doe Doctors and Nurses, and fact discovery appears to have closed on April 15, 2016.  (*See* ECF No. 59, Revised Scheduling Order dated February 2, 2016.)   The Court will provide Plaintiff with 30 days to file a motion to amend the Complaint to identify the John and Jane Doe Doctors and Nurses, and makes no determination at this time as to whether such amendment will be permitted.[10]

---

[9] The Court notes that Plaintiff's Amended Complaint does not allege any direct claims against CCS.  The Complaint does allege claims against John and Jane Doe Doctors and Nurses, who are employed by CCS.  A corporation under contract with the state or municipality, however, cannot be held liable for the acts of its employees or agents under a theory of *respondeat superior*.  *See Natale v. Camden County Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003).  Instead, an entity under contract with the state may be held liable for the acts of an employee if those acts are deemed the result of a policy or custom where the inadequacy of an existing practice is so likely to result in the violation of constitutional rights that the entity can reasonably be said to have been deliberately indifferent to the plaintiff's serious medical needs.  *Albrecht v. Correctional Med. Services*, No. 06-2772MLC, 2009 WL 1834320, at *7 (D.N.J. June 25, 2009) (citing *Natale* 318 F.3d at 584).

[10] Plaintiff's motion to amend the Complaint would be proper only if it relates back to the original Complaint.  *See* Fed. R. Civ. P. 15(c)(1).  Pursuant to Rule 15(c)(1)(A), an amended complaint relates back to the filing of the original complaint if relation back is allowed under the law that provides the applicable statute of limitations, in this case, New Jersey law.   New Jersey law also determines whether the Second Amended Complaint relates back to the filing date of the Complaint.  *See Padilla v. Twp. of Cherry Hill*, 110 F. App'x. 272, 276 (3d Cir. 2004). Under New Jersey law, a plaintiff may avail themselves of the so-called fictitious party rule if a defendant's true identity is "unknown" at the time of filing.  N.J. Ct. R. 4:26–4; *Mears v. Sandoz Pharm., Inc.*, 300 N.J. Super. 622, 631–32 (App. Div. 1997).  Rule 4:26–4 provides in relevant part that "if the defendant's true name is unknown to the plaintiff, process may issue against the defendant under a fictitious name, stating it to be fictitious and adding an appropriate description sufficient for identification." *Id.*  Rule 4:26-4 further provides that "Plaintiff shall on motion, prior to judgment, amend the complaint to state defendant's true name, such motion to be accompanied by an affidavit stating the manner in which that information was obtained."  *Id.* Whether a Plaintiff may avail himself of N.J.R. 4:26–4 typically turns on three factors: (1) whether plaintiff exercised due diligence in identifying the proposed defendants; (2) whether the lapse of time has prejudiced the proposed defendants; and (3) whether plaintiff acted with due diligence in substituting the proposed defendants once they were identified.  *See Padilla*, 110 F.

V.       **CONCLUSION**

For the reasons explained in this Opinion, the County Defendants' motion for summary judgment is granted as to the failure to protect claim against Officer Christopher Dixon.  The County Defendants' motion for summary judgment is likewise granted as to the inadequate medical treatment claims against Warden Brian Elwood and the County of Monmouth.  The Court declines to dismiss the Third Party Complaint against CCS, or consider the additional arguments raised by Third Party Defendant CCS in the absence of a properly filed motion, which CCS is free to file.  The Court will also provide Plaintiff with 30 days in which to file a motion to amend the Complaint to identify the John and Jane Doe Doctors and Nurses.  An appropriate Order follows.


/s/ Freda L. Wolfson
Freda L. Wolfson, U.S.D.J.

Date: October 24, 2016

---

Appx. at 277.  Plaintiff's motion to amend should address these factors and provide the relevant legal analysis.